Filed 10/26/15  Haines v. Farley CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WALTON HAINES, et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>DENNIS FARLEY, et al.,<br><br>        Defendants and Appellants. | H038628<br>(Santa Cruz County<br>Super. Ct. No. CV157538) |

This appeal is from a judgment after a court trial in a dispute between adjoining landowners.  The dispute is about the existence of an easement for a right-of-way over the defendants' property.  The plaintiffs own six adjoining parcels of land in the Santa Cruz Mountains, which they refer to jointly as Haines Ranch.  The defendants, Celma and Dennis Farley, own two parcels of land along the western boundary of Haines Ranch.  One of these parcels includes the alleged easement at issue.  After a 13-day court trial, the court found that the plaintiffs had a deeded easement for a right-of-way over the Farleys' property.  The Farleys appeal.

The Farleys challenge (1) the trial court's finding of a deeded easement, and (2) the trial court's conclusion that the easement described in the deeds is located on their property, as opposed to property north of their parcels.

We agree with the trial court's conclusion that the plaintiffs have a deeded easement for a right-of-way. We also hold that substantial evidence supports the trial court's findings regarding the location of the easement, and we reject the Farleys' contention that the plaintiffs or their predecessors in interest abandoned the easement. We will therefore affirm the judgment.

## FACTS

### I. Parties and Properties at Issue

The plaintiffs are Walton ("Walt") and Barbara Haines (husband and wife), Ronald and Lois DiBenedetti (husband and wife), Duard and Kathleen LaFrentz (husband and wife), and William Vass and Shari Steele (husband and wife).[1] We shall hereafter refer to the plaintiffs jointly as "Plaintiffs."

Plaintiffs own six adjoining parcels of land—136 acres in all—located in the Santa Cruz Mountains. These six parcels are commonly known as Haines Ranch. Walt Haines's ancestors purchased Haines Ranch in the 1890's. Lois DiBenedetti is Walt Haines's sister. Duard LaFrentz has been friends with Walt Haines since they were teenagers in the 1950's. And Vass and Steele purchased their two parcels from Walt Haines's brother, Daniel Haines. (We shall hereafter usually use the names "Haines," "DiBenedetti," and "LaFrentz" to refer to Walt Haines, Ronald DiBenedetti, and Duard LaFrentz respectively. We shall refer to other members of the Haines family by both their first and last names.)

_____

[1] At oral argument, Vass's counsel reported that he had just learned that the LaFrentzes, Vass, and Steele had sold their three parcels to one individual who is not a party to the appeal. Vass's counsel, therefore, made an oral request to withdraw from the case, which we denied on procedural grounds. Vass's counsel also reported that the new owner "does not oppose the appeal."

2

Haines Ranch is bounded on the north by Fern Flat Road; on the northwest, west, and southwest by Bear Springs Gulch (which contains Bear Springs Creek); and on the southeast and east by Valencia Creek. The southern-most point of the property is the point where Bear Springs Gulch intersects with Valencia Creek. Haines Ranch is part of a much larger area known as West Valencia, which is part of a Mexican land grant—the Soquel Augmentation Rancho—that includes parts of Watsonville and Aptos.

Defendants Dennis and Celma Farley (husband and wife) own two adjoining parcels of land directly west of Haines Ranch. The Farleys and the owners of two other properties located north of the Farleys' parcels share a common boundary with Haines Ranch along Bear Springs Gulch; the Farleys' parcels cover more than two-thirds of that boundary. Plaintiffs claim an easement for a right-of-way across the northern portion of the Farleys' property.

## II. 1894 and 1899 Land Sale Contracts

The properties at issue were once part of the vast holdings of Frederick A. Hihn, an entrepreneur and land developer in Santa Cruz County from 1851 to 1913. (Stevens & Schwantes, *Frederick Augustus Hihn*, in Immigrant Entrepreneurship: German-American Business Biographies, 1720 to the Present, vol. 2 (Hausman, edit., 2015) German Historical Institute <http://immigrantentrepreneurship.org/entry.php?rec=23> [as of Oct. 22, 2015], hereafter "Hihn Biography".) On May 12, 1894, F.A. Hihn Company (Hihn's business) entered into a land sale contract with Edward Haines (Haines's great-grandfather) and David Haines (Haines's great uncle) for the sale and purchase of the 136 acres[2] that would become Haines Ranch. The contract price was $4,094.10. The

---

[2] The contract actually provides for the sale of 136.47 acres. For ease of reference, we have rounded that number to 136, as did the parties below.

contract term was ten years, with the purchase price, plus six percent interest, to be paid in ten equal annual installments.

The land sale contract contained a legal description of the property, which included this description of a right-of-way: "Together with a right of way for a road twenty feet wide over the most practicable route from the North-west line of said described land to the Fern Flat Road, to be selected by [the buyers] within sixty days from this date." The contract provided that upon payment in full, F.A. Hihn Company would execute a grant deed in favor of the Haineses.

As stated, the northern boundary of Haines Ranch runs along a portion of Fern Flat Road. From the northwest corner of Haines Ranch, Fern Flat Road continues in a generally westward direction, then changes directions toward the southeast, wrapping around most of the 110 acres to the west of Haines Ranch—which include the Farleys' property—and continues in a generally southwest direction from there. Looking at a two-dimensional map, there are theoretically numerous points along the northwest side of Haines Ranch where one could access Fern Flat Road by crossing over the neighboring lands to the west.

In January 1899, the F.A. Hihn Company, Edward Haines and David Haines entered into a second land sale contract for the Haines Ranch property. The second contract added Harry Haines (Edward Haines's son and Walt Haines's grandfather) as a buyer. At oral argument, Haines stated this was done because Harry Haines turned 18 years old in 1899. The purchase price was reduced to $2,972.14 in recognition of amounts already paid toward the original contract price. The record contains a ledger from the F.A. Hihn Company showing amounts paid or credited in trade toward the purchase of Haines Ranch from 1894 until 1917. The balance due as of 1899 on the original land sale contract was $2,972.14, the amount of the purchase price in the 1899 contract.

4

The 1899 land sale contract provided that the new purchase price would be paid in 10 "equal annual installments," together with interest, "until paid." It contained a legal description of the property, including this description of a right-of-way: "Together with a right of way for a road twenty feet wide over the most practicable route from the North-west line of said described land to the Fern Flat Road, to be selected by [the buyers] within sixty days from date [*sic*]." Thus, the description of the right-of-way in the second contract was almost identical to the description of the right-of-way in the first contract. Neither the 1894 nor the 1899 land sale contract was recorded. At trial, the Farleys argued there was no evidence the Haineses selected the "most practicable route" for the right-of-way within 60 days as required by the land sale contracts and that, as a result, no easement right was ever created.

The second land sale contract provided that the buyers "may take possession of the said land and may occupy the same while conforming to the terms of this contract." Haines testified that according to census records, his family has occupied Haines Ranch since 1894.

The Haineses worked for Hihn. Between 1894 and 1917, the Haineses made regular payments toward the purchase of Haines Ranch, including cash payments, trade on another lot, payroll credits, and credits for apples and "sundries." F.A. Hihn Company paid the property taxes and added that cost, plus the interest, to the Haineses' account each year. By April 1917, the Haineses had paid $6,109.97 in principal, interest, and property taxes, but still owed F.A. Hihn Company $2,857.32 for the property.

## III.    *1917 Decree of Partition*

Frederick Hihn died in 1913. (Hihn Biography.) At the time of his death, he owned lumber mills, hotels, mercantile businesses, corporate investments, and more than 13,000 acres of land. (*Ibid.*) Hihn's property was divided among his successors and heirs by a decree of partition in June 1917. Hihn's granddaughter, Ruth Ready, inherited

5

numerous parcels of land in West Valencia, including the parcel that had been sold to the Haineses (Haines Ranch) and the adjoining 110-acre parcel, which included the land that would become the Farleys' property.

The legal description of the land Ruth Ready inherited in the partition decree mentions the land sale contracts with the Haineses. That description includes a reference to the point where Valencia Creek intersects with Fern Flat Road, and then states: "which point is also the most northeasterly boundary of lands contracted to one Edw. Haines, . . . ." The 1917 decree of partition was recorded. James Weller, Plaintiffs' title expert, testified that Ruth Ready's title to the property was subject to the 1894 land sale contract with the Haineses.

In 1917, Ruth Ready was 16 years old. Both of her parents had died and her aunt, Agnes Hihn Younger (Frederick Hihn's daughter), was her guardian. Agnes Younger and her husband Charles Younger raised Ruth Ready, who eventually took their surname. (For ease of reference, we shall hereafter refer to Ruth Ready Younger and Agnes Hihn Younger by their first names only.)

### IV. *1921 and 1923 Deeds*

Between 1917 and 1921, Ruth sold some of her property. In July 1921, "in consideration of the love and affection which she [bore]" to Agnes, Ruth conveyed an "undivided one-half" interest in the remaining property she had inherited—which included Haines Ranch and the Farleys' property—to Agnes. The property description in the 1921 deed disclosed the existence of the land sale contracts with the Haineses, repeating the same phrase used in the decree of partition, which referred to "the most northeasterly boundary of lands contracted to one Edw. Haines, . . . ." The 1921 deed was recorded.

In January 1923, Ruth conveyed the property that was the subject of the land sale contracts (Haines Ranch) to David Haines and Harry Haines for $10. The property

6

description in the grant deed included the following language: "Together with a right of way for a road twenty feet wide over the most practicable route from the northwest line of said described land to the Fern Flat Road." The description of the right-of-way in the 1923 deed did not include the phrase "to be selected by [the buyers] within sixty days from this date" that appeared in the land sale contracts. The 1923 deed was signed by Agnes as attorney-in-fact for Ruth. Agnes appeared before a notary and acknowledged that she had "subscribed the name of Ruth R. Younger [to the deed] as principal, and her own name as attorney in fact." This deed was recorded in June 1923. As we discuss in Section III.C., *post,* this deed conveyed Ruth's undivided one-half interest in the property, but not Agnes's undivided one-half interest. (As we shall explain, later conveyances confirmed Agnes's intent to also convey her interest in the easement.)

Plaintiffs' title expert, Weller, testified that the 1923 deed discharged Ruth's "ministerial" duty under the land sale contracts to convey the property to the Haineses. He testified that 1923 was the first time the Haineses had a recorded deed to the property. Prior to that, based on the land sale contracts, they had an equitable estate in the property that was fully vested, and they had a possessory right. According to Weller, in land title practice, a grant deed conveys title to that which is described in the deed and everything appurtenant to it, whether or not it is described in the deed. Weller also testified that in Santa Cruz County in the late 19th and early 20th century, it was very common to see grants of rights-of-way without any particular description of their routes or locations (i.e., by metes and bounds); it was sufficient to say the right-of-way began on one line and ended on another.

### V. 1927 Conveyance of Properties Adjacent to Haines Ranch

In December 1927, Ruth, Agnes, and others conveyed several parcels of land near Haines Ranch to Peninsula Properties Company. Ruth and Agnes's conveyance included the 110 acres directly west of Haines Ranch, which included the land that would become

7

the Farleys' property. The description of the property conveyed in the 1927 deed includes a reference to the adjacent "lands conveyed by Ruth . . . to David A. Haines" in 1923.

Importantly, the 1927 deed contains a reservation that refers to the right-of-way that is the subject of this litigation. A reservation is a clause in a deed or other instrument of transfer in which the grantor reserves to himself or herself some right or interest in the property granted. "A reservation allows a grantor's whole interest in the property to pass to the grantee, but revests a newly created interest in the grantor." (*Willard v. First Church of Christ, Scientist* (1972) 7 Cal.3d 473, 476 (*Willard*).) For example, in the 1923 deed to the Haineses, Ruth reserved the right to use the waters in Valencia Creek and Bear Springs Creek.

The 1927 deed, which was signed by both Ruth and Agnes, contains the following reservation: "Reserving from said first above-described tract of land that certain right of way for a road 20 feet wide over the most practicable route leading from the northwest boundary of lands conveyed by Ruth R. Younger to David A. Haines and Harry E. Haines by deed dated January 5th, 1923, and recorded in [the] Official Records of Santa Cruz County to the Fern Flat Road and being that same right of way as mentioned in said Deed."

### VI. 1957 Conveyance of Property Adjacent to Haines Ranch

In 1957, Santa Cruz Land Title Company conveyed lands west and north of Haines Ranch—which included the land that would become the Farleys' property—to Walter and Evangeline Purcell. This deed contains the following reference to the disputed right-of-way: "SUBJECT to the rights, for road purposes, given by the deed from Ruth R. Younger to David A. Haines and Harry E. Haines by Deed dated January 5, 1923, and recorded in . . . the Official Records of Santa Cruz County." (All caps in

original.)  In their opening brief, the Farleys acknowledge that this deed is in their chain of title.

## VII.    *Further Description of the Right-of-Way and Surrounding Area*

Haines was 68 years old at the time of trial, which means he was born in 1942 or 1943.  He started going to Haines Ranch when he was two or three years old.  Haines remembers riding with his uncle in a jeep over the right-of-way when he was a child. Haines has driven on the right-of-way himself ever since he was 16 years.  The Haines family and others referred to the right-of-way as "Bear Springs Road."  (In their opening brief, the Farleys use several different names or phrases to describe the right-of-way that is the subject of this litigation, including "north-west right of way," "north-western right-of-way," "western right-of-way," "trail to the north-west," "Bear Springs Gulch Road," and "other road."  The right-of-way was also referred to at trial as "the back way."  For clarity and ease of reference we shall hereafter use the terms "right-of-way" or "easement" and will capitalize "Right-of-Way" when referring to the roadway at issue.)

In addition to the Right-of-Way, which provided access to Fern Flat Road over lands to the west of Haines Ranch, two other roadways are relevant to this appeal.  The first is Haines Ranch Road, a private road.  From the eastern boundary of Haines Ranch, it travels in a westerly direction, connecting five of the parcels within Haines Ranch, then turns to the left—in a southerly direction—on Vass and Steele's property, connecting their two parcels to the rest of Haines Ranch.  Haines Ranch Road also continues beyond the eastern boundary of Haines Ranch, through lands to the east of Haines Ranch, and eventually connects to Rider Road, the second roadway of importance.  Evidence adduced at trial showed that Haines Ranch Road existed since before 1919.  Thus, the residents of Haines Ranch claim two access roads:  (1) the Right-of-Way, which they have used to travel westward to Fern Flat Road and then to Aptos; and (2) Haines Ranch Road, which they use to travel eastward to Rider Road, and then to Watsonville.

9

The Right-of-Way crosses Bear Springs Gulch and Bear Springs Creek at a point on the LaFrentz/Farley property line.  For as long as Haines could remember, there was a road across Bear Springs Gulch.  He testified that the Right-of-Way has always crossed the gulch and creek at this point.  Historically, like many other stream crossings in the mountains, there was a bridge made of "stacked," cross-hatched redwood over the creek.  In 1970, the redwood crossing was replaced by a metal culvert with an earthen roadbed over it.  In the early 1990's, the Fern Flat Road Association installed a new metal culvert (which was also covered by dirt) at the crossing over Bear Springs Gulch.

## VIII.  *Development and Subdivision of Haines Ranch*

In 1958, Haines's parents, Leslie and Dorothy Haines, acquired Haines Ranch by grant deed.  Their deed described the Right-of-Way, using the same language as the 1923 deed.

In 1965, Haines and his brother, Daniel Haines, had Haines Ranch surveyed by Stanley Smith.  Haines was 22 years old at the time and did not have much money, so Smith agreed that Haines and his brother could do the manual work required to complete the survey.  DiBenedetti and LaFrentz helped with this effort.  At that time, Haines had an agreement with his parents to improve Haines Ranch Road to an all-weather road in exchange for a parcel of land in Haines Ranch.

The survey was completed in 1965 and recorded in 1966.  The survey contains a surveyor's note that described Haines Ranch Road as a "right of way of necessity."  It stated that "[m]embers of the Haines family have been using this road as their sole access since 1894."  Haines asked Smith to put something on the survey for "prescriptive purposes" and this is what Smith came up with.  Haines testified that it was not true that Haines Ranch's sole access was over Haines Ranch Road to the east.  Smith made the same note on surveys he completed in 1972 and 1974.  All three surveys were recorded.

In September 1966, Haines's parents deeded portions of Haines Ranch to Haines and to his brother, Daniel Haines. Between 1966 and 1974, Haines developed Haines Ranch Road as a 50-foot wide, all-weather road because his parents planned to subdivide the property. In the early 1970's, PG&E acquired easements for power pole construction in the vicinity of the Right-of-Way and along Haines Ranch Road from the Farleys' predecessors in interest, the Haineses, and others.

Haines moved to Haines Ranch in 1972. At that time, he believed he had access to the west over the Right-of-Way and access to Rider Road to the east over Haines Ranch Road. Haines testified that he used the Right-of-Way continuously from 1970 or 1971 until 2007, when it was blocked by the Farleys.

In 1974, Haines obtained deeded access over lands east of Haines Ranch to Rider Road and did not have to rely on a prescriptive easement theory to obtain that access. There were many times in the past when Rider Road was impassable and the only way out of Haines Ranch was over the Right-of-Way to the west.

The DiBenedettis acquired their parcel in August 1974. When DiBenedetti worked in San Francisco or the South Bay, he used the Right-of-Way to commute to work. The LaFrentzes purchased their parcel from Haines's parents and his older brother, Vernon Haines, in July 1989. Vass and Steele purchased their properties from Daniel Haines in February 2007, a few months before this action was filed. The deed to their northern-most parcel describes the disputed Right-of-Way.

Vass testified that he walked the entire western boundary line of his property and the LaFrentzes' property "with great difficulty." He testified there is no place other than the Right-of-Way to build an access road across Bear Springs Creek, unless one were to construct a really big bridge because the gulch is steep and the creek is deep. Vass did not see any evidence of any other roads along the western boundary of Haines Ranch.

The residents of Haines Ranch declined to join the Fern Flat Road Association, which did most of the maintenance on the Right-of-Way. They had an agreement with

11

the association that they would not pay for their incidental use of the Right-of-Way, but if it should ever become their primary access, they would join the association. In exchange, members of the association were not required to pay for their incidental or emergency use of Haines Ranch Road. For a time, Mrs. Miller, who lived west of Haines Ranch, used the Right-of-Way and Haines Ranch Road to commute to work. The residents of Haines Ranch did some maintenance on the Right-of-Way between 1991 and 2001, including grading and gravelling the roadbed, filling potholes, and removing slides and fallen branches.

Haines testified that when he was younger (including in the 1970's), he used the Right-of-Way mostly for recreational purposes (hunting, fishing, camping). Over the years, he used the Right-of-Way "thousands" of times to go to Aptos, but the Right-of-Way was never his primary access to Haines Ranch.

## IX. The Farleys' Property

The Farleys purchased their 17-acre property in April 2001 and moved in on May 1, 2011. They had horses and wanted an "end-of-the-road" property. No one disclosed any easements or rights-of-way over their property to them before they moved in. About 30 days after they moved in, Celma Farley saw Daniel Haines drive a truck across her property, then across Bear Springs Gulch, onto Haines Ranch. After that, the Farleys installed a gate at the western entrance to their property.

In August 2001, the Farleys had two confrontations with Daniel Haines when he attempted to use the Right-of-Way. The first time, he opened the gate and told them he had "deeded rights." The Farleys asked him for documentation, but allowed him to pass. After that, the Farleys locked the gate. The second time, Celma Farley told Daniel Haines there was no evidence of the Right-of-Way on her deed, refused to allow him to pass, and called the sheriff. The deputy sheriff asked the Farleys to allow Daniel Haines to use the Right-of-Way one time until they could resolve the issue in court, and the

Farleys agreed. According to LaFrentz, Daniel Haines used the Right-of-Way every weekend in 2001.

On August 15, 2001, the Farleys' lawyer sent LaFrentz and Daniel Haines a letter complaining that they were speeding past the Farleys' house and demanding that they "cease and desist" until they proved a right to use the Right-of-Way. The letter said the Farleys would be filing suit and seeking a temporary restraining order the following week. There is no evidence that such action was ever undertaken. According to LaFrentz, Daniel Haines got his lawyer involved, the issue appeared to have been resolved, and the residents of Haines Ranch continued to use the Right-of-Way.

In 2001, the Farleys put in a permanent fence near the creek, which blocked the Right-of-Way. Haines would take a portion of the fence down when he wanted to use the Right-of-Way and Dennis Farley would thereafter put it back up. Haines discussed the fence with Dennis Farley and told him he had a deeded easement. Farley apologized and said he wanted to be a good neighbor, so they agreed he would put in a gate.

After the problems in 2001, the residents of Haines Ranch reduced their use of the Right-of-Way in an effort to respect the Farleys' privacy. But Haines continued to use the Right-of-Way two, three, or more times per year after 2001. He believed he still had access to the Right-of-Way because the Farleys had put in a gate.

In 2002, someone damaged the culvert and LaFrentz could not cross over the Right-of-Way at the gulch. One end of the culvert had been dug up and the other end was plugged with a piece of wood. Dennis Farley agreed to repair it but never did, so the residents of Haines Ranch repaired it.

In 2003, Dennis Farley requested a meeting with the residents of Haines Ranch to discuss moving the Right-of-Way further away from his house. At the time, the residents of Haines Ranch used the Right-of-Way for occasional access; their primary access was over Haines Ranch Road to the east. Haines, LaFrentz, and DiBenedetti met with Dennis Farley. Haines was skeptical that the Right-of-Way could be moved because Bear

13

Springs Gulch is very steep north of the point where the Right-of-Way crosses the gulch. But he told Farley he did not object to moving the Right-of-Way as far north as possible as long as it met fire department and county access requirements.

After the meeting, the Farleys made some changes to the Right-of-Way. They blocked the existing Right-of-Way with a retaining wall and rerouted the roadway around the retaining wall, which required users to make a sharp 90 degree turn. LaFrentz described the changes as "totally unsafe." When Dennis Farley asked Haines and the others whether they accepted the changes, Haines said he did not think the county would approve it. But Haines nonetheless agreed to call the county and the fire department and told the Farleys that if those entities accepted the changes, he would too. The Farleys got "very upset" at the idea of calling the county, asked the residents of Haines Ranch not to call, and restored the Right-of-Way to its prior condition within a week. (Celma Farley testified that none of this ever happened.)

In June 2007, Plaintiffs discovered that the Farleys had blocked the Right-of-Way with a large dirt berm, 15 to 20 feet high, located a short distance from the creek. The berm was constructed of logs and other wood debris, covered by dirt. The Farleys covered the berm with erosion control netting and removed the metal culvert from the creek. Celma Farley did the work herself, operating a loader and moving dirt from other parts of her property to the berm. The Farleys consulted with an engineer and the work was done pursuant to plans the engineer had prepared. There was evidence the Farleys started the project in 2005; it took two years to complete. They claimed they were restoring the property to its original condition and the berm was an erosion control measure. After they installed the berm, the Farleys reconfigured a portion of the Right-of-Way west of the blockage and built a horse corral over another section of the Right-of-Way.

There are no recorded maps showing the precise location of the Right-of-Way. The Right-of-Way was an all-weather road for a time in the 1980's and again in the

14

1990's. There was testimony that thereafter it was not an all-weather road and that it would become impassable after a bad winter storm until it was repaired or until the rainy season ended.

### X. Expert Testimony Presented at Trial

After this litigation was filed, Haines retained geotechnical engineer Michael Van Horn to inspect the western and northwestern boundary of Haines Ranch to determine whether there was an alternate location where a road could cross over Bear Springs Gulch. Van Horn inspected the property in August 2007 and again in October 2007 as part of a formal site inspection with counsel, the parties, and other experts. Van Horn found no evidence that any roads other than the Right-of-Way had ever crossed Bear Springs Gulch. He also concluded, based on the topography of the gulch, that the location of the Right-of-Way was the most logical and practical place to build a road. He said "there was really no other location practicable or amenable to road construction." He testified that the Right-of-Way appeared to be very old in the areas where it had not been masked by the Farleys.

Plaintiffs' land survey expert, Curt Dunbar, walked along the gulch from Fern Flat Road to a point 150 to 200 feet south of the Right-of-Way and concluded that the location of the Right-of-Way is the most practicable route along the northwest boundary for a road.

The Farleys' land survey expert, Jeff Nielsen, testified that (1) the Right-of-Way was on the western, not the northwestern, boundary of Haines Ranch, (2) there was no evidence a route was ever selected for the Right-of-Way as required by the 1894 land sale contract, (3) there was no evidence in the title record that the Right-of-Way ran through the Farleys' property, and (4) a review of surveys and maps supports the conclusion that the right-of-way mentioned in the deeds was on property north of the Farleys' property. The Farleys also presented expert testimony by law professor Cynthia Mertens that a

15

deeded easement was never created because the Haineses never satisfied the condition in the land sale contracts that required them to select a route for the Right-of-Way within 60 days. Mertens also opined that to the extent an easement was created, it was abandoned through (1) non-use during a 20-year period when Fern Flat Road did not exist and (2) by notations on the Smith surveys regarding "sole access" over Haines Ranch Road to the east.

**PROCEDURAL HISTORY**

Plaintiffs filed their complaint for declaratory relief, quiet title, and injunctive relief on July 11, 2007. The case was tried to the court over 13 days in October and November of 2011. During trial, the court conducted a site inspection of the properties at issue, which all parties and their counsel attended.

On December 30, 2011, the court issued its written decision. The court found that Plaintiffs had a deeded easement for a right-of-way over the Farleys' property. It based its finding on: (1) the 1894 land sale contract, (2) the 1917 partition decree, (3) the 1921 deed from Ruth to Agnes, (4) the 1923 deed from Ruth to the Haineses, and (5) the 1927 deed from Ruth and Agnes to Peninsula Properties. The court observed that the 1923 deed "involves the same property as . . . the 1894 Agreement" and used the same language as that agreement to describe the Right-of-Way. The court concluded that "no confusion existed amongst the involved parties as to the location of the 'most practicable route,' " since the "exact same language" was used in documents that were created 29 years apart. The court also noted that the 1927 deed used the same language to describe the Right-of-Way. The court concluded it "was presented with three[] separate documents, spanning over thirty-three years describing a right of way where, again, it appears no party ever raised a concern as to the location of such a right of way."

The court rejected the Farleys' contention that there was no right-of-way because the condition in the land sale contract that required the Haineses to select the route within

16

60 days was never satisfied. The court also rejected the Farleys' contention that Ruth's 1921 conveyance to Agnes rendered invalid the references to a right-of-way in the 1923 and 1927 deeds. The court reasoned: if Agnes or her heirs still owned a 50 percent interest in Haines Ranch, why did neither Agnes (who died in 1957 or 1958) nor her heirs "exercise[] any possessory interest or title interest in this property over the past 84 years? The pragmatic conclusion is that . . . all parties to the 1894, 1919, 1921, 1923 and 1927 events clearly understood what was transferred and what was being retained . . . ." The court also found it "significant" that both Ruth and Agnes signed the 1927 deed that "confirmed and perfected the easement." As for defendant's challenge to the location of the Right-of-Way, the court found the testimony confirmed "the location of this 'route' has been in existence for several decades" and that there has never been "a more reasonable or 'practicable' manner, or location, . . . to cross Bear Springs Gulch." The court also rejected Plaintiffs' claim of a prescriptive easement.

In January 2012, the Farleys objected to the court's decision and requested a statement of decision on 24 separate issues. Plaintiffs filed responses to the Farleys' objections and to the request for a statement of decision. In February 2012, the court adopted its December 30, 2011 decision as its statement of decision and asked the parties to submit briefs on a proposed judgment, including the form of injunctive relief to be granted.

On June 4, 2012, the court entered judgment for Plaintiffs on their claim of easement by deed. The court ordered Plaintiffs to "pay for a metes and bounds survey of the subject road" and to record that survey within six months of the date of the judgment. It ordered all parties to cooperate to permit completion of the survey. The court ordered the Farleys to "[u]nblock the easement area," including removing all obstructions they had placed there. The court ordered: "The easement area is to be returned to what it was before the [Farleys'] efforts, not better and not worse. Before the [Farleys] removed the culvert, bulldozed dirt onto the easement area, and constructed the horse barn, this

17

easement area was a seasonal, dirt road, not passable during the rainy season. This is what it should be returned to, and this work shall be performed within six months of the recordation of the . . . survey." The court also ordered the Farleys to reinstall the culvert, and it rejected a suggestion that the Farleys be required to construct a bridge over Bear Springs Gulch.

The court ordered the Farleys to pay for the cost of restoring the Right-of-Way. It also ordered that "Plaintiffs are responsible for all ongoing upkeep and maintenance of the easement area, from Bear Springs Gulch to Fern Flat Road. [The Farleys] shall not interfere with Plaintiffs' usage of the easement area, including any obstructing or damaging of said area . . . . [¶] The easement shall follow its original location, and shall connect Plaintiffs' properties at Bear Springs Gulch . . . to the road that leads from [the Farleys'] property to Fern Flat Road." At trial, Plaintiffs waived any claims they may have had for damages due to the blockage of the easement for five years.

## DISCUSSION

According to the Farleys' opening brief, the "sole issue on appeal is whether plaintiffs have established a right to an easement by deed at the alleged location." This issue has two components: whether the trial court erred when it found that (1) Plaintiffs have a deeded easement for a right-of-way; and (2) the easement is located on the Farleys' property at the location claimed by Plaintiffs. The Farleys also assert that Plaintiffs have abandoned the easement.

### I. Standard of Review

The parties disagree regarding the applicable standard of review. The Farleys contend the questions presented ("the meaning of the legal documents and the obligation to satisfy the conditions subsequent and fix and record the location of the alleged right-of-way within a reasonable time") are issues of law, which are subject to the de novo

18

standard of review. They argue, alternatively, that to the extent the issues involve the "trial court's erroneous factual findings," those issues are subject to the substantial evidence standard.

Plaintiffs counter that since the trial court resolved disputed factual issues and conflicting inferences, the substantial evidence standard applies. They contend the Farleys' arguments and the disputed evidence compel review under that standard and that the judgment is supported by substantial evidence.

The general rule is that the interpretation of a writing (the land sale contracts and the deeds) is a question of law, subject to the de novo standard of review. (*Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865-866.) But if the writing is ambiguous and the parties presented extrinsic evidence to aid in the interpretation of the writing and that evidence is in conflict, the substantial evidence rule applies. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 ["where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld"].)

In this case, we will review the question whether the trial court erred in finding a deeded easement under the de novo standard. Although the parties presented some extrinsic evidence regarding that issue (i.e., the land sale contracts and the deeds), it was not conflicting. As for the location of the easement, the parties presented conflicting extrinsic evidence on the meaning of the phrases "over the most practicable route from the North-west line" or the "northwest boundary" in the land sale contracts and the deeds. The location of the Right-of-Way, if it existed as a legal matter, was a disputed factual question. We will therefore review the court's judgment relating to the location of the easement under the substantial evidence standard of review.

The Farleys argue that under the substantial evidence standard, "the record as a whole must support the factual findings made by the trial court" and that the record here,

19

as a whole, does not support the trial court's findings that Plaintiffs have a deeded easement or that the Right-of-Way is the easement described in the deeds. To the extent this description of the substantial evidence test suggests that this court's role is to review the whole record and decide the case anew, that is not our role. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, original emphasis omitted.) So long as there is substantial evidence to support a trial court's factual findings, an appellate court must affirm the resulting judgment, even if the reviewing justices personally would have ruled differently if they had presided over the proceedings below and even if other substantial evidence supports a different result. (*Id.* at p. 874.) An appellate court is "not in a position to weigh any conflicts or disputes in the evidence. Even if different inferences can reasonably be drawn from the evidence, [an appellate court] may not substitute [its] own inferences or deductions for those of the trial court. . . . Therefore, we must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 778-779.)

"Substantial" evidence, however, is not synonymous with "any" evidence. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) "Substantial" evidence is evidence of "ponderable legal significance"; it must be "reasonable . . . , credible, and of solid value . . . ." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) "Thus, the focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990)

220 Cal.App.3d 864, 871.)  Indeed, the testimony of a single witness may constitute substantial evidence.  (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

## II. General Legal Principles Regarding Easements

An easement is a nonpossessory interest in the land of another that entitles the owner of the easement to limited use or enjoyment of the other's property.  (*City of Long Beach v. Daugherty* (1977) 75 Cal.App.3d 972, 977; 10 Cal. Real Estate Law & Practice (2014) Easements & Licenses, § 343.10[1], p. 343-7 (Cal. Real Estate).)  The Civil Code lists several types of easements, including rights-of-way.  (Civ. Code, §§ 801, subd. (4); 802, subd. (5); 662; all further statutory references are to the Civil Code, unless otherwise stated.)  A "right-of-way" is a type of easement that gives a person or a class of persons the right of passing over the land of another.  (*Wood et. al. v. Truckee Turnpike Co.* (1864) 24 Cal. 474, 487.)  Although the legal right to pass is referred to as the "right-of-way," the tangible strip of land over which the easement runs may also be described as a "right-of-way," as we have done in this opinion.  (*Anderson v. Willson* (1920) 48 Cal.App. 289, 295.)

An easement for a right-of-way may be appurtenant or in gross.  (§§ 801, 802.) " 'An easement is *appurtenant* when it is attached to the land of the owner of the easement, and benefits him as the owner or possessor of that land.  The land to which it is attached is called the *dominant tenement*, and the land which bears the burden, i.e., the land of another which is used or enjoyed, is called the *servient tenement*.' "  (*City of Anaheim v. Metropolitan Water Dist. of Southern Cal.* (1978) 82 Cal.App.3d 763, 767; original italics.)  An easement in gross is not attached to any particular tract of land as the dominant tenement and belongs to a person individually.  (§ 802; *LeDeit v. Ehlert* (1962) 205 Cal.App.2d 154, 165.)  The owners of the servient tenement are entitled to use the land in any way that "does not interfere unreasonably" with the limited interest of the

21

easement owners.  (*Pasadena v. California-Michigan, etc. Co*. (1941) 17 Cal.2d 576, 579 (*Pasadena*).)

Any document that indicates an intent by one party to establish a right to use his or her property by another establishes an easement.  (*Rice v. Capitol Trailer Sales of Redding* (1966) 244 Cal.App.2d 690, 692.)  Among other things, an easement may be created by contract (i.e., the land sale contracts), express conveyance (i.e., the 1923 deed), or express reservation (i.e., the 1927 deed).  (Cal. Real Estate, *supra*, § 343.15[1][a], [3][a], & [5][a], pp. 343-40, 343-52, 343-56 citing *Petersen v. Friedman* (1958) 162 Cal.App.2d 245, 247-248 [express reservation]; *Weller v. Brown* (1911) 160 Cal. 515, 519 [contract]; see e.g., *Hamilton Court, LLC v. East Olympic, L.P*. (2013) 215 Cal.App.4th 501, 503-504 [contract].)

Since an easement appurtenant is attached to a dominant tenement, it passes with the transfer of the dominant tenement.  (*Conaway v. Toogood* (1916) 172 Cal. 706, 712 (*Conaway*) ["the rule is well established in this state that an easement as a right of way is incident to the land and passes with it unless expressly excepted by the terms of the deed"].)  "This is true even if the easement is not mentioned in the instrument of transfer."  (Cal. Real Estate, *supra*, § 343.11[2], p. 343-12; *Conaway*, at p. 712, citing §§ 1084, 1104; *Rubio Cañon etc. Assn. v. Everett* (1908) 154 Cal. 29, 33 (*Rubio*).)

### III. *Sufficiency of the Evidence to Support the Trial Court's Finding of a Deeded Easement*

#### A. Absence of References to the Right-of-Way in Recorded Documents

The Farleys attack the judgment by arguing that a number of documents in the public record do not mention the Right-of-Way, including:  (1) the 1917 partition decree and the 1921 deed from Ruth to Agnes; (2) the 1958 quitclaim deed in favor of Haines's parents; (3) the 1966, 1972, and 1974 surveys by Smith; (4) the 1972 and 1974 subdivision maps for Haines Ranch; (5) deeds that were executed after 1970 transferring

22

parcels within Haines Ranch to the DiBenedettis, the LaFrentzes, and Daniel Haines; (6) one of the Vass and Steele deeds; and (7) deeds for lands west of Haines Ranch.

As we have stated, "an easement as a right of way is incident to the land and passes with the land unless expressly excepted by the terms of the deed" (*Conaway*, *supra*, 172 Cal. at p. 712.) This rule applies even when the easement is not mentioned in the instrument of transfer. (*Rubio*, *supra*, 154 Cal. at p. 33.)

There is no evidence that the Right-of-Way was expressly excepted from any of the deeds listed by the Farleys. That the Right-of-Way was not mentioned in one of the Vass and Steele deeds is of no consequence, since their access to the Right-of-Way was from the northernmost section of their two parcels and the deed to that parcel mentioned the Right-of-Way.

As for the 1917 partition decree and the 1921 deed from Ruth to Agnes, there was no need to mention the Right-of-Way in either document since at both times the dominant tenement (the property that would become Haines Ranch) and the servient tenement (the 110 acres west of Haines Ranch that included the now-Farley property) were under common ownership. Generally, no easement exists as long as there is a unity of ownership between the properties involved. (§ 805 ["[a] servitude thereon cannot be held by the owner of the servient tenement"].) Since Ruth inherited both of the properties at issue, there was no need to mention the easement in the 1917 partition decree. And since Ruth conveyed an undivided one-half interest in both properties to Agnes, there was no need to mention the easement in the 1921 deed.

In both 1917 and 1921, the Haineses had a possessory interest in Haines Ranch, since they lived there pursuant to the terms of the land sale contracts. Those contracts included a right-of-way over the property west of Haines Ranch—land in which the Haineses did not have either a legal or a possessory interest other than the Right-of-Way. And both the 1917 partition decree and the 1921 deed acknowledged the Haineses' contractual rights to use the Right-of-Way by mentioning the land sale contracts.

23

That the Right-of-Way was not mentioned in the Smith surveys or the subdivision maps for Haines Ranch does not persuade us that the trial court erred when it found Plaintiffs have a deeded easement for the Right-of-Way. Haines testified that the purpose of the surveys was to establish the boundaries of Haines Ranch. And the purpose of the subdivision maps was to establish the division of the 136-acre Haines Ranch tract into six separate parcels. In light of these purposes and the rules set forth above, that those documents failed to mention the Right-of-Way does not mean it did not exist.

For these reasons, we conclude there is no merit to the Farleys' assertion that a deeded easement did not exist because it was not mentioned in the documents enumerated above.

### B. The Requirement that the Easement Route be Selected Within 60 Days in the 1894 and 1899 Contracts Was Not a Condition Subsequent

The 1894 and 1899 land sale contracts provided that the route for the right-of-way was "to be selected by [the buyers] within sixty days." The 1894 contract provided that the route was to be selected within 60 days "from this date," meaning the date of the contract (May 12, 1894). The 1899 contract appears to contain a typographical error. It says: "sixty days from date." We read this language as "sixty days from *this* date," meaning the date of the 1899 contract (January 2, 1899). Since the wording of this clause is almost identical in both contracts, we infer an intent to carry over this provision from the 1894 contract to the 1899 contract.

The Farleys argue that Plaintiffs presented no evidence that the right-of-way was selected within 60 days of the execution of either contract "or any reasonable time thereafter." They assert that inclusion of the 60-day requirement in the 1899 contract is evidence that no right-of-way was selected by July 11, 1894 (60 days after the 1894 contract was signed). They argue that the 60-day requirement is a condition subsequent to the creation of the easement, and since there is no evidence the location of the

24

easement was chosen within 60 days of execution of either contract, Plaintiffs' deeded easement claim fails in its entirety.

Plaintiffs counter that the Farleys have not established that a condition subsequent was created, that any such condition applies in this case, or that any such condition "mandates forfeiture—a harsh and disfavored result." Plaintiffs contend the Farleys' "only support for their claim of forfeiture is their own opinion and citation of two statutes, without discussion or analysis of either." Citing *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, Plaintiffs argue that this court may disregard the issue because "the relevance of the cited authority is not discussed or points are argued in conclusionary form." (*Id.* at p. 979.) They also argue that even if we address the issue on the merits, this claim fails. We will address the Farleys' condition subsequent argument on the merits.

"A condition subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." (§ 1438.) "With respect to interests in real estate in particular, '[c]onditions subsequent are those which in terms operate upon an estate conveyed and render it liable to be defeated for breach of the conditions. Such conditions are not favored in law because they tend to destroy estates, and no provision in a deed relied on to create a condition subsequent will be so interpreted if the language of the provision will bear any other reasonable construction. While no precise form of words is necessary to create a condition subsequent, still it must be created by express terms or by clear implication.' (*Hawley v. Kafitz* (1905) 148 Cal. 393, 394 . . . ; see § 1442 ['A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created.'].)" (*Wooster v. Department of Fish & Game* (2012) 211 Cal.App.4th 1020, 1027 (*Wooster*).) Like other interests in real property, "[a]n easement may be conveyed subject to conditions subsequent and extinguished if they occur." (*City*

25

*of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 260 (conc. & dis. opn. of Mosk, J.).)

Here, the land sale contracts provided that the route for the Right-of-Way was to be selected within 60 days of the date of each contract. The question is whether these provisions were intended to operate as a condition subsequent, such that the Haineses alleged failure to comply with the 60-day requirement would extinguish the easement, or instead were intended to operate only as a covenant, the breach of which could give rise to a cause of action for breach of contract but would not result in extinguishment of the easement. (See *Wooster*, *supra*, 211 Cal.App.4th at p. 1027.)

"The rule against construing language in a deed [or land sale contract] as a condition subsequent is merely a specific application of the more general rule that '[t]he law abhors forfeitures.' (*Lamont v. Ball* (1949) 93 Cal.App.2d 291, 294 . . . .) . . . As our Supreme Court said long ago, it is 'the settled policy of the law not to enforce a forfeiture in the absence of a clear statement to that effect.' (*Universal Sales Corp. v. Cal. etc. Mfg. Co*. (1942) 20 Cal.2d 751, 771 . . . .) That rule applies no matter *what* is subject to the alleged forfeiture." (*Wooster*, *supra*, 211 Cal.App.4th at p. 1027, original italics; see also 1 Witkin, Summary of Cal. Law (10th ed., 2005) Contracts, § 826, p. 915 ["Forfeitures are not favored; hence a contract, and conditions in a contract, will if possible, be construed to avoid a forfeiture"]; § 1442.)

We begin by noting that the land sale contract clauses that created the easement do not use the word "condition" or the phrase "condition subsequent." That the parties used the same language in both the 1894 and 1899 contracts supports the conclusion that in 1899, the seller (Hihn Company) intended for the Haineses to have a right-of-way over its lands to the west, regardless of whether the route for the easement had been selected within 60 days from the date of the original 1894 contract. Thus, almost five years after entering into the first contract, the seller evinced an intent not to avail itself of or to enforce the 60-day requirement as a condition subsequent. (§ 1438.) Rather than treat

the 60-day requirement as a condition subsequent, the breach of which would defeat the easement, the seller in 1923 and 1927 reaffirmed the grant of the easement without any reference to the 60-day requirement. The grant of the easement and the elimination of the 60-day requirement in the 1923 deed support the conclusion that the Haineses had selected the route for the easement no later than 1923 and that Hihn Company, and later Ruth (to the extent a route had not been timely selected), had waived the 60-day requirement. For these reasons, we conclude the trial court was correct when it (1) rejected the Farleys' arguments that the 60-day requirement was a condition subsequent, and (2) held that no forfeiture of the easement resulted from the alleged breach of the 60-day requirement.

### C. The 1923 and 1927 Conveyances Establish the Grantors' Intent to Create an Easement for a Right-of-Way in Favor of Haines Ranch

In 1921, Ruth conveyed a one-half undivided interest in what remained of the property she acquired in the 1917 partition to Agnes. This included Haines Ranch, the 110 acres west of Haines Ranch, and other lands. In 1923, Ruth then conveyed Haines Ranch (including the easement) to the Haineses. And in 1927, Ruth and Agnes conveyed the 110 acres west of Haines Ranch (which included land that is now the Farleys' property) to Peninsula Properties, reserving the easement from that grant.

The Farleys argue that the 1923 deed from Ruth to the Haineses failed to create an easement over the 110 acres—or to even transfer Haines Ranch to the Haineses—because in 1923 both Ruth and Agnes owned both properties at issue as tenants-in-common and only Ruth signed the 1923 deed. The Farleys assert that to transfer an easement to the Haineses, both Ruth and Agnes were required to sign the 1923 deed. The trial court rejected this contention, stating: "[I]f one accepts the [Farleys'] position as viable, i.e., that Agnes . . . still owns a fifty percent interest in the Haines Ranch property, why have neither [Agnes], nor her heirs, ever exercised any possessory interest or title interest in

27

this property over the past eighty-four years?  The pragmatic conclusion is that no such effort was made as all parties to the 1894, 1917, 1921, 1923, and 1927 events clearly understood what was transferred and what was being retained (in particular easement rights).  Additionally, it is significant to this Court that both Ruth . . . and Agnes . . . signed the 1927 Deed [that] reconfirmed and perfected the easement."

Citing *Pfeiffer v. Regents of the University of California* (1887) 74 Cal. 156 (*Pfeiffer*), the Farleys assert that a "tenant-in-common cannot, either by conveyance to another, or by reservation to himself in a conveyance of his interest, create an easement in the common property."  They argue that the 1923 grant of an easement solely by Ruth "across the alleged servient tenement is without force, void and fails as a matter of law."  As we will explain, this rule is not as absolute as the Farleys contend and is subject to limitations set forth in both *Pfeiffer* and subsequent authority.

Indeed, in *Pfeiffer,* the California Supreme Court stated generally that a "tenant in common cannot *create* an easement or servitude upon the common land."  (*Pfeiffer*, *supra*, 74 Cal. at p. 162, italics added.)  But in the same paragraph, the court qualified the rule, stating:  "One joint owner or tenant in common cannot *create* an easement in the common estate as against his co-tenant, though probably he would be himself estopped to dispute a grant thus made.  For the same reason, one tenant in common cannot, when conveying his [or her] own interest in the common property, *create* by reservation a personal and separate easement over the same for the benefit of his adjoining separate property."  (*Pfeiffer*, at p. 162, italics added.)

Almost 30 years later, the California Supreme Court explained:  ". . . it was held in *Pfeiffer* . . . , that one tenant in common could not by his conveyance *create* an easement in the common land which would be good against any of the tenants other than himself."  (*East Shore Co. v. Richmond Belt Ry.* (1916) 172 Cal. 174, 178, italics added.)

More recently, the Court of Appeal in *King v. Oakmore Homes Assn.* (1987) 195 Cal.App.3d 779 (*King*) stated:  " 'case law . . . has 'consistently held that one joint

28

tenant has not by reason of the relationship any authority to bind his cotenant with respect to the latter's interest in the common property.' [Citations.] One cotenant cannot, without special authority from the other cotenants, encumber the entire estate, and any deed of trust, mortgage or other encumbrance given by only one cotenant affects only his interest in the property.' [Citations.] Thus, absent the cotenant's consent, a tenant may not *create* an easement in the common estate against his cotenant, settle a claim for damages to the common property, contract with third persons concerning the common property [citation], . . . . [Citation.]" (*Id.* at pp. 783-784, italics added.) And Miller and Starr, California Real Estate (3d ed. 2006) Holding Title, section 12:11, page 12-26 explains the rule as follows: "One cotenant cannot create an easement in the common estate enforceable against the other cotenants without their consent."

Applying these rules to the facts here, even if Ruth's 1923 grant was not valid as to Agnes's undivided one-half interest in the 110 acres west of Haines Ranch, it was valid as to Ruth's interest. And since Ruth owned an *undivided* one-half interest in the servient tenement, as a practical matter, that Agnes allegedly failed to grant her undivided one-half interest did not affect the Haineses ability to continue using the Right-of-Way as against Ruth's undivided interest. Moreover, if Agnes consented to the grant of the easement, then the Haineses right to use the easement would be enforceable against both Ruth and Agnes. As we shall explain, there was substantial evidence that Agnes consented to the 1923 grant of the easement for a right-of-way over the 110 acres west of Haines Ranch. But first we will address two points raised by Plaintiffs.

Plaintiffs suggest the aforementioned rule relating to easements in common estates does not apply, since the 1923 grant did not *create* the easement. But they do not cite any cases on point. Each of the authorities cited above uses the word "create" and refers to the creation of an easement. In this case, the right to the easement was first created by the 1894 and 1899 land sale contracts that predated the 1923 deed. The easement had existed for 29 years when Ruth deeded the property to the Haineses. The record also

29

supports the conclusion that the easement right was perfected long before Ruth's 1921 grant to Agnes of an undivided one-half interest in the property. Thus, the property right that Agnes received in 1921 was subject to the Haineses' contractual right to an easement.

We are not persuaded that a different rule applies because the easement was created before the 1923 deed. We find *Pfeiffer, supra*, instructive on this point. From 1864 until 1870, the defendant in *Pfeiffer* (the Regents of the University of California and its predecessor, the College of California) held an undivided interest in 2,900 acres of "hill land" as a tenant in common with other parties. (*Pfeiffer*, *supra*, 74 Cal. at p. 158.) Previously, in 1860, the defendant had obtained an easement to divert water from a portion of the property occupied by another cotenant for use by the University of California. (*Id.* at p. 160.) After it acquired an undivided interest in the property in 1864, the defendant erected flumes, pipes and reservoirs to divert additional water from the property, without objection by its cotenants. In 1870, the defendant conveyed its undivided interest to another, reserving therefrom the right to continue diverting water from the property. (*Id.* at p. 159.) In 1875, certain cotenants filed a partition action to terminate the cotenancy and apportion the property. Upon the grant of partition, one of the former cotenants objected to the defendant's continued diversion of water and filed an action to quiet title and enjoin the defendant from diverting water from land she received in the partition. (*Id.* at pp. 157-158.) Although not expressly addressed in the opinion, the fact that the easement and reservation that created the right to divert water predated the partition did not prevent the court from applying the rules set forth above to conclude that the defendant's grant and reservation of the easements were unenforceable as to its former cotenant who had not consented to the easement. (*Id.* at pp. 162-164.) We likewise find no reason to apply a different rule here on the basis that the easement was created prior to the 1923 deed.

Citing *King*, Plaintiffs also rely on an exception to the general rule that applies when one cotenant acts for the benefit of the property. (*King*, *supra,* 195 Cal.App.3d at p. 783.) Under that exception, " '[o]ne cotenant can at any time protect the entire estate from injury or loss without calling to his aid the assistance of the other cotenants, and his act will inure to their benefit. He can resist an intruder, or evict a trespasser, remove an encumbrance, or redeem from a burden, and since his acts . . . are in the interest of and for the benefit of his cotenants, their authority therefor, if necessary, will be presumed.' " (*Id.* at pp. 783-784, quoting *Los Angeles L. Co. v. Los Angeles* (1895) 106 Cal. 156, 160.) But the court in *King* concluded that this exception did not apply in that case "because the exception contemplates action that wholly benefits the property, whereas the Declaration of Restrictions, being an equitable servitude, constitutes both a benefit to and a burden on the property." (*King*, at p. 784.) Instead, the court applied "the general rule limiting a cotenant's power to encumber property without the cotenant's consent." (*Ibid*.)

Plaintiffs argue that "[b]y the 1923 deed, Ruth . . . acted for the benefit of the property when she conveyed the Haines Ranch property in accordance with the 1894 agreement," since the "1923 deed discharged the vendor's duties under the 1894 contract." They assert that a "failure to fulfill the obligations of the 1894 contract could have subjected Ruth . . . and Agnes . . . to breach of contract for failure to convey title." They also argue there was no evidence that Agnes's interest was injured or negatively affected by the conveyance and that Agnes's consent to the conveyance was evident from her execution of the 1923 deed as attorney in fact for Ruth.

The Farleys argue that the exception from *King* does not apply because the easement was a burden on the rest of Ruth and Agnes's property.

We need not determine whether the exception for a cotenant who acts for the benefit of the property applies, since the evidence supports the conclusion that Agnes consented to the grant of the easement. As we have noted, the 1923 deed was signed by Agnes as attorney-in-fact for Ruth. Agnes appeared before a notary and acknowledged

31

that she had signed Ruth's name to the deed as principal, "and her own name as attorney in fact." A reasonable inference from these facts is that Agnes consented to the grant of Haines Ranch and the easement to the Haineses. By 1923, the easement had been in existence for 29 years. Then, in December 1927, Ruth, Agnes, and others conveyed several parcels of land to Peninsula Properties. Ruth and Agnes's conveyance included the 110 acres west of Haines Ranch. The 1927 deed, which was signed by both Ruth and Agnes, reserved from the land granted to Peninsula Properties "that certain right of way for a road 20 feet wide over the most practicable route leading from the northwest boundary of lands conveyed by Ruth [to the Haineses in] 1923, . . . to the Fern Flat Road and being that same right of way as mentioned in [the 1923] Deed." Plaintiffs' title expert, Keating, testified that although the 1923 deed was flawed because it was not signed by both Ruth and Agnes, the 1927 deed—which was signed by both women— confirmed the grant made in 1923. He opined that Agnes ratified the 1923 easement grant when she signed the 1927 deed, which contained an express reservation of the easement. In his view, even if the deeds were not legally correct, they expressed the grantors' intent to create an easement over the 110 acres west of Haines Ranch for the benefit of Haines Ranch.

"The cardinal requirement in the construction of deeds . . . , as in the construction of other instruments, is that the intention of the parties as gathered from the whole instrument must govern. [Citations.]" (*Basin Oil Co. of Cal. v. City of Inglewood* (1954) 125 Cal.App.2d 661, 663 (*Basin*).) "If an intention to pass particular title is disclosed, the court will give effect to such intention notwithstanding inaccuracy of expression or inaptness of the words used." (*Ibid*.) Reading the 1923 and 1927 deeds together, we conclude they provide substantial evidence that both Ruth and Agnes intended to convey an easement for a right-of-way to the Haineses.

## D. The Common Law Rule Prohibiting Reservations in Favor of Third Parties Does not Apply in this Case

The Farleys argue that the 1927 deed to Peninsula Properties did not transfer the Right-of-Way to the Haineses because the Haineses were not parties to that deed and because reservations in favor of third parties were barred in 1927. They acknowledge that the common law rule prohibiting reservations in favor of third parties was abolished by the California Supreme Court in 1972 in *Willard*, *supra*, 7 Cal.3d 473, but nonetheless urge us to apply the now-abolished common law rule since the 1927 deed was executed before *Willard* was decided.

In *Willard*, McGuigan sold a parcel of land to Petersen subject to an easement for use as a parking lot by a church across the street. "The [trial] court found that McGuigan and Petersen intended to convey an easement to the church, but that the clause they employed was ineffective for that purpose because it was invalidated by the common law rule that one cannot 'reserve' an interest in property to a stranger to the title." (*Willard*, *supra*, 7 Cal.3d at pp. 475-476.) The California Supreme Court declared that the common law rule was no longer the rule in California and reversed the judgment. The court explained: "The rule derives from the common law notions of reservations from a grant and was based on feudal considerations. A reservation allows a grantor's whole interest in the property to pass to the grantee, but revests a newly created interest in the grantor. [Citation.] While a reservation could theoretically vest an interest in a third party, the early common law courts vigorously rejected this possibility, apparently because they mistrusted and wished to limit conveyance by deed as a substitute for livery by seisin. [Citation.] Insofar as this mistrust was the foundation of the rule, it is clearly an inapposite feudal shackle today. Consequently, several commentators have attacked the rule as groundless and have called for its abolition. [Citations.]" (*Id.* at p. 476, footnote omitted.)

33

Although "California early adhered to this common law rule," the Supreme Court stated that in "considering our continued adherence to it, we must realize that our courts no longer feel constricted by feudal forms of conveyancing. Rather, our primary objective in construing a conveyance is to try to give effect to the intent of the grantor. [Citations.] In general, therefore, grants are to be interpreted in the same way as other contracts and not according to rigid feudal standards." (*Willard*, *supra*, 7 Cal.3d at p. 476.) The court concluded that "[t]he common law rule conflicts with the modern approach to construing deeds because it can frustrate the grantor's intent" and produce inequitable results "because the original grantee has presumably paid a reduced price for title to the encumbered property." (*Id.* at p. 477.) The court also noted that the common law rule conflicts with section 1085, enacted in 1872, which provides that an interest in property "may be taken by any natural person under a grant, although not named a party thereto." (*Id.* at p. 477, fn. 3; 7A West's Ann. Civil Code (2007) § 1085, p. 380.) The court observed that "[i]n view of the obvious defects of the rule," California appellate courts and courts in other jurisdictions, had "found methods to avoid it where applying it would frustrate the clear intention of the grantor," citing cases from California and other jurisdictions, most of which predated the 1927 deed in this case. (*Id.* at pp. 477-478 & fns. 4-6.) The *Willard* court observed: "The determination whether the old common law rule should be applied to grants made prior to our decision involves a balancing of equitable and policy considerations. We must balance the injustice which would result from refusing to give effect to the grantor's intent against the injustice, if any, which might result by failing to give effect to reliance on the old rule and the policy against disturbing settled titles." (*Id.* at p. 479.) The court concluded the balance fell "in favor of the grantor's intent," and "the old common law rule may not be applied to defeat her intent." (*Ibid.*)

In this case, as in *Willard*, there was no evidence that the parties to the 1927 deed or anyone else relied on the now-abolished common law rule. By 1927, there was

34

already case law that rejected using the common law rule " 'to defeat the manifest intent of the parties . . . .' " (*Willard*, *supra*, 7 Cal.3d at p. 477, fn. 4 quoting *Sutter Butte C. Co. v. Richvale L. Co*. (1919) 40 Cal.App. 451, 456-457.)  In addition, a reasonable inference from the facts here is that the reservation of an easement was added to the 1927 deed to correct the allegedly flawed grant of an easement in the 1923 deed.  If the 1923 deed had been signed by both Ruth and Agnes, there would have been no need to mention the easement in the 1927 deed, since the easement is appurtenant and runs with the land.  Reservation of the easement in the 1927 deed, however, insured that future purchasers of the 110 acres west of Haines Ranch were put on notice of the easement.  As in *Willard*, the documents here, read together, support the conclusion that both Ruth and Agnes intended to convey an easement for a right-of-way in the 1923 and 1927 deeds; we will not apply the now-abolished common law rule to defeat that intent.  (*Willard*, at p. 479.)

### E.  Absence of a Recorded Power of Attorney

Finally, the Farleys argue that the 1923 deed is invalid because there is no recorded power of attorney in the chain of title authorizing Agnes to sign the 1923 deed on Ruth's behalf.  The Farleys contend that under the Equal Dignities Rule and section 1091, any writing that is subject to the Statute of Frauds, including a deed, requires that the agent have written authority to bind the principal.  But they do not cite any legal authority that requires that a power of attorney be recorded in order for the deed to be valid in these circumstances.  There is no evidence that Agnes did not have Ruth's authority to sign the 1923 deed on her behalf.  In our view, any challenge to the 1923 deed on the ground that Agnes was not authorized to sign it belonged to Ruth, and there is no evidence Ruth ever challenged the 1923 deed.  Moreover, as Plaintiffs argue, Ruth's signature on the 1927 deed confirmed the easement and ratified Agnes's previous action as Ruth's attorney in fact on the 1923 deed.

The intent of the parties as expressed in the land sale contracts and the deeds was that the Haineses would have an easement for a right-of-way over the 110 acres west of Haines Ranch. We thus conclude the trial court did not err in finding that a deeded easement existed.

### IV. *Sufficiency of the Evidence to Support the Trial Court's Finding that the Easement Is on the Farleys' Property at the Location Claimed by Plaintiffs*

The Farleys argue there is no evidence that the Right-of-Way claimed by Plaintiffs "is [in] the location of the easement described" in the contracts and the deeds. The trial court found that an "appropriate conclusion" from the 1923 deed was that "no confusion existed amongst the involved parties as to the location of the 'most practicable route' " since the exact same language was used in the 1894 contract, the 1899 contract, and the 1923 deed, which documents "were created 29 years apart."

### A. Meaning of "northwest line" or "northwest boundary"

The Farleys argue that the "location of [the] easement as alleged by [P]laintiffs does not comport with the deed language," which describes the Right-of-Way as beginning on the "north-west line" or the "northwest boundary" of Haines Ranch and continuing out to Fern Flat Road. The Farleys contend that the claimed Right-of-Way on their property starts on the *western* boundary of Haines Ranch, not the *northwest line*, and they argue that "[t]here is no inference that can be made from the proferred evidence that would allow any trier of fact to find that this path on the western boundary of Haines Ranch is the easement described in the recorded documents." We disagree.

"In construing an instrument conveying an easement[,] the rules applicable to the construction of deeds generally apply. [Citations.] Accordingly, where the language of a grant of easement is ambiguous, extrinsic evidence is admissible to determine its meaning. [Citations.] Where such evidence is properly received the appellate court will

36

accept or adhere to the interpretation adopted by the trial court where the extrinsic evidence is conflicting and conflicting inferences arise therefrom. (*Parsons v. Bristol Development Co.* [(1965)] 62 Cal.2d 861, 865-866 . . .; [citation].) Where, on the other hand, extrinsic evidence is received but there is no conflict in the evidence the interpretation of the instrument becomes a question of law and the appellate court is not bound by the trial court's interpretation of it. [Citations.]" (*McManus v. Sequoyah Land Associates* (1966) 240 Cal.App.2d 348, 353.)

A grant or reservation of an easement is enforceable even though the instrument creating the easement fails to specify a definite location or route for the easement. "An easement granted in general terms, nonspecific as to its particular nature, extent or location, is . . . perfectly valid. It entitles the holder to choose a 'reasonable' location and to use such portion of the servient tenement as may be reasonably necessary for the purposes for which the easement was created. The use actually made by the holder over a period of time fixes the location and the nature and extent of the use." (*Colvin v. Southern Cal. Edison Co.* (1987) 194 Cal.App.3d 1306, 1312, overruled on another ground by *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1103-1109.)

" 'It is not essential to the validity of the grant of a right of way that the way be indicated by metes and bounds or by figures or other description giving definite dimensions of the easement. A grant which designates the right of way as such and definitely describes the lands which are servient is sufficient. [Fn. omitted]. If the location and limits of the right of way are not defined in the grant, a reasonably convenient and suitable way is presumed to be intended, and the right cannot be exercised over the whole of the land. . . .' [Citation.] 'In determining the intent of the parties, consideration may be given not only to actual uses being made at the time of the grant, but also to such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance.' [Citation.]"

(*Maywood Mut. Water Co. No. 2 v. City of Maywood* (1972) 23 Cal.App.3d 266, 270-271 (*Maywood*).)

In this case, the 1894 and 1899 land sale contracts and the 1923 deed used the term "right of way" and generally defined its starting point (on the northwest line) and ending point (Fern Flat Road). At the time of the grant, Ruth and Agnes owned all of the land west and north of Haines Ranch. And although Haines Ranch was bounded on the north by Fern Flat Road, the 1923 deed expressly provided for a separate right-of-way over the grantors' lands off the northwest line. Although the deed does not expressly identify the 110-acre parcel west of Haines Ranch as the servient tenement, the map of West Valencia shows that at the time of the grant, the 110-acre parcel west of Haines Ranch was bounded almost entirely by Fern Flat Road or Haines Ranch, except for a small area at the southernmost end of that parcel. A reasonable inference from the location and configuration of the properties is that the grantors intended to provide alternative access to Fern Flat Road through the 110-acre parcel. In addition, the Haineses had lived on the property since 1894; by the time of the 1923 grant, they had lived at Haines Ranch for 28 or 29 years. Since the grant did not specify the exact location of the easement, "a reasonably convenient and suitable way is presumed to be intended." (*Maywood*, *supra*, 23 Cal.App.3d at pp. 270-271.)

"With deeds as any other contracts, '[t]he primary object of all interpretation is to ascertain and carry out the intention of the parties. [Citations.] All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument. [Citation.]' [Citations.] 'Extrinsic evidence is "admissible to interpret the instrument, but not to give it a meaning to which it is not susceptible" [citations], and it is the instrument itself that must be given effect.' " (*City of Manhattan Beach v. Superior Court*, supra, 13 Cal.4th at p. 238 [deed ambiguous as to whether it conveyed fee simple or merely easement; extrinsic evidence used to determine its meaning], citing *Burnett v. Piercy* (1906) 149 Cal. 178, 189.)

38

"The cardinal requirement in the construction of deeds . . . , as in the construction of other instruments, is that the intention of the parties as gathered from the whole instrument must govern. [Citations.]" (*Basin*, *supra*, 125 Cal.App.2d at p. 663.) " 'Under the rules of construction the whole instrument must be read together to determine the effect of a deed, . . . .' If an intention to pass particular title is disclosed, the court will give effect to such intention notwithstanding inaccuracy of expression or inaptness of the words used." (*Ibid.*, citing *Parks v. Gates*, *supra*, 186 Cal. at p. 154.)

The 1894 and 1899 land sale contracts provided for the sale of 136 acres plus "a right of way for a road twenty feet wide *over the most practicable route from the Northwest line* of said described land to the Fern Flat Road, to be selected by [the buyers] within sixty days from [this] date." (Italics added.) The 1923 deed included the grant of "a right of way for a road twenty feet wide *over the most practicable route from the northwest line* of said described land to the Fern Flat Road." (Italics added.) And the 1927 deed of property to the west of Haines Ranch reserved a "right of way for a road 20 feet wide *over the most practicable route leading from the northwest boundary* of lands conveyed by Ruth" to the Haineses in the 1923 deed. (Italics added.)

The Farleys disputed the location of the easement and argued that the "northwest line" and "northwest boundary" referred to in the contracts and deeds is not on their common boundary with Haines Ranch. They argued that the northwest line is on the common boundary between Haines Ranch and one of the two parcels north of their property, or even on property north of Fern Flat Road. It is important to note that the segment of the boundary line where the easement crosses Bear Springs Gulch is located in the northwest quadrant of Haines Ranch and runs in a generally southwest direction.

The parties presented conflicting evidence on the meaning of these phrases. The Farleys' land surveying expert, Jeff Nielsen, opined that the "northwestern line" was located on one of the parcels north of the Farleys' land and that the claimed Right-of-Way through the Farleys' property was located on the *western* as opposed to the

*northwestern* boundary of Haines Ranch. Plaintiffs' land title expert, Weller, testified that the "northwest line" refers to the entire boundary line that has a general northwest orientation, even though certain segments in the line may not have a northwest orientation. Plaintiffs' land survey expert, Brian Happte, testified that the "northwest line" of Haines Ranch runs along Bear Springs Gulch and that it included the property line along the entire northwest quadrant of Haines Ranch. Plaintiffs' other land survey expert, Curt Dunbar, testified that the "northwest line," if you divide the property into quadrants, "would go from the top of Fern Flat Road to approximately the midpoint along the western side." Dunbar testified that an authoritative text called "Writing and Interpreting Legal Descriptions" by Gordon Wattles sets forth surveying standards. The definition in Wattles's text, which the Farleys' counsel read into the record, was consistent with Weller's testimony that one considers the general orientation of the line, even though some segments of the line point in a different direction. Under any of these definitions, the claimed Right-of-Way would be on the northwest line, even though the segment of the boundary line where the Right-of-Way crosses Bear Springs Gulch runs in a generally southeasterly direction.

In addition to the expert testimony set forth above, the maps at Exhibits 34 and 100D support the conclusion that the claimed Right-of-Way begins generally on the northwest line, not the western boundary of Haines Ranch as the Farleys contend. As we have stated, Haines Ranch is bounded on its northwestern and western side by Bear Springs Gulch (which contains Bear Springs Creek). Starting at the northwest corner of Haines Ranch and moving south, the creek runs along a generally northwest-oriented line for about two thirds of the length of the boundary of Haines Ranch and then switches course to a southeasterly direction at the southern end of the Farleys' northernmost parcel. The maps support the conclusion that the northwest line includes everything from the northwest corner of Haines Ranch to the point where Bear Springs Creek changes course and starts to travel in a southeasterly direction. Even though there are segments

40

within that line that change directions, the overall orientation of the line between those two points is to the northwest and consistent with the "northwest line" described in the contracts and deeds. The testimony of Plaintiffs' experts and the maps at Exhibits 34 and 100D constitute substantial evidence that supports the trial court's conclusion that the claimed Right-of-Way starts on the northwest line and is the easement described in the contracts and deeds.

As for the requirement that the easement be "over the most practicable route" from the northwest line, there was also substantial evidence that the point where the Right-of-Way crossed Bear Springs Gulch was the most practicable location for a roadway because of the topography and depth of the gulch. Van Horn, Dunbar, and Vass all walked along the gulch and opined that the location of the existing crossing was the most practicable place along the northwest boundary to cross the gulch. Van Horn and Vass also testified that they saw no other evidence of a roadway across the Bear Springs Gulch side of Haines Ranch other than the Right-of-Way.

### B. That the Easement has not Been Previously Surveyed or Shown on a Recorded Map Does Not Defeat the Easement

The Farleys complain that the trial court "failed to address the undisputed evidence that [the Right-of-Way] has never been surveyed or mapped or noted on any recorded document until after this litigation in 2007." But the Right-of-Way is mentioned in the 1923 deed from Ruth to the Haineses, the 1927 deed to Peninsula Properties, and in one of Vass's deeds from early 2007, all of which were recorded before this litigation was filed. That the Right-of-Way was never surveyed or mapped does not defeat Plaintiffs' right to the easement. "The selection of an easement's location need not be made in any formal manner. The use of the easement in a particular course without objection by the owner of the servient tenement establishes the easement along the route used." (6 Miller & Starr, Cal. Real Estate (3d ed. 2006) Easements, § 15:50, pp. 15-169

41

to 15-170, citing *Youngstown Steel Products Co. of California v. City of Los Angeles* (1952) 38 Cal.2d 407, 410 and other cases.)  Haines, DiBenedetti, and LaFrentz all testified that they and others (Daniel Haines, Mrs. Miller, other members of the Haines family) used the Right-of-Way for many years without objection from the Farleys' predecessors in interest.  Haines's son, Jesston Haines, and the Farleys' neighbor, William Pedersen, also testified that they used the Right-of-Way.

The Farleys' reliance on *Tucker v. Watkins* (1967) 251 Cal.App.2d 327 (*Tucker*) and *Leverone v. Weakley* (1909) 155 Cal. 395 (*Leverone*) is misplaced.  The plaintiffs in *Tucker* sought to enjoin the defendants' use of a dirt road on the plaintiffs' property.  The defendants cross-complained to enjoin the plaintiffs from blocking the road.  (*Tucker*, *supra*, 251 Cal.App.2d at p. 329.)  The appellate court held that the road was a public road that had never been abandoned by the county and remanded to the trial court for further proceedings.  (*Id.* at pp. 330-331.)  In dicta, the court observed that the defendants were faced with an "almost . . . insurmountable task" of proving the location of the road on retrial, since the road, which was near a river, had been washed out for 29 years and there were no recorded documents showing the location of the road.  (*Id.* at pp. 329, 332.) The court rejected the contention that a right-of-way may be shown by its terminus alone and distinguished the cases the defendants cited by observing that the roads in those cases were "shown to have a visible location on the ground."  (*Id.* at pp. 332-333.)

In *Leverone*, the court held that a complaint was uncertain in its description of an alleged right-of-way and that a demurrer based on that ground should have been sustained.  (*Leverone*, *supra*, 155 Cal. at pp. 398-399.)  The court observed that there was "nothing to indicate that the way is so marked on the ground that the description given [in the complaint] will identify it" and nothing in the record supported such a finding.  (*Id.* at pp. 399, 400.)

Here, there was substantial evidence that the Right-of-Way had a visible location on the ground.  Plaintiffs submitted a photograph showing a portion of the road before the

Farleys constructed the dirt berm. Photographs of the berm show that it was constructed over a roadway. Michael Van Horn and Brian Happte both testified that during the site inspection, they saw a roadway on the Farleys' property, except in the areas that had been covered by the berm, the corral, or debris. A roadway is visible in the photographs and the video recording of their site inspection. Van Horn testified there was no evidence of any other roadways across the gulch, that the cuts along the Right-of-Way were very old, and that the road appeared to be very old where it had not been masked by the Farleys. And during the October 2007 site inspection, Happte and his crew were able to see the Right-of-Way and survey its location.

"A 'floating easement'—that is an easement for right-of-way . . . which, when created, is not limited to any specific area on the servient tenement—becomes 'fixed' by the first usage thereof and, unless the right to change or expand the usage is expressly granted or reserved, the usage may not thereafter be modified, either in location or in degree beyond that originally established." (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 541, fn. 1, citing *Winslow v. City of Vallejo* (1906) 148 Cal. 723.)

The Farleys argue that the "logical implication of the application of case law to floating easements is that at some reasonable point in time the fixed location must be recorded in order to be enforceable" and that the location of the floating easement in this case has never been recorded. But they do not cite any cases that require: (1) recordation for the easement to be valid or (2) that the location of the easement must be recorded within a certain time. The judgment directed Plaintiffs to survey the Right-of-Way and ordered that the survey be recorded. In our view, these actions are sufficient to fix the location of the easement.

43

### C. Sufficiency of the Evidence That the Easement Existed in 1894 or 1927 and of its Location at That Time

The Farleys argue that assuming the floating easement was fixed in 1894 or 1927, Plaintiffs were required to present evidence showing the exact location of the easement at that time. They contend there was no evidence the Right-of-Way existed in 1894 or 1927, of its location at that time, or that the Right-of-Way on the ground is the same easement described in the contracts and deeds.

Having carefully reviewed the record, we hold there is substantial evidence that supports the trial court's finding that the Right-of-Way at issue is the Right-of-Way described in the contracts and deeds. Haines testified that his family used the easement as far back as he could remember, including in the 1940's. He described the redwood bridges that were used at the crossing over Bear Springs Gulch before the first metal culvert was installed in the 1970's. The historic ranch house on Haines Ranch was located relatively close to and directly east of the point where the easement crossed Bear Springs Gulch. As Vass's counsel argued at trial, the location of the easement provided "quick and easy access to Fern Flat Road to the west," bypassing a longer, circuitous route around the neighboring 110-acre parcel. There was expert testimony, based upon the topography of the area, that the current location of the Right-of-Way was the only practicable point along Bear Springs Gulch for a roadway, that the roadbed was very old, and that there was no evidence of any other roads over Bear Springs Gulch. Thus, substantial evidence supports the trial court's finding that the easement on the ground is the same easement described in the contracts and the deeds.

### V. The Farleys Have Not Demonstrated Abandonment

The Farleys argue that, assuming there was a valid deeded easement, the easement was abandoned by decades of non-use. They also argue the easement was abandoned by the Haineses' efforts to create a right-of-way to the east to Rider Road.

44

An easement created by an express grant or reservation "is not lost by mere nonuse, no matter how long, and may be lost by abandonment only when the intention to abandon clearly appears. [Citation.] [¶] Abandonment is a question of fact for the trial court or the jury [citation] which will not be disturbed on appeal if the trial court's determination is supported by substantial evidence. [Citation.] Abandonment hinges upon the intent of the owner to forego all future conforming uses of the property, and there must be conduct demonstrating that intent which is so decisive and conclusive as to indicate a clear intent to abandon. [Citation.]" (*Tract Development Services, Inc. v. Kepler* (1988) 199 Cal.App.3d 1374, 1384-1385, citing *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 889, 890-892; 6 Miller & Starr, Cal. Real Estate (3d ed. 2006) Easements, § 15:79, p. 15-254.) The burden of proving the owner's intent to abandon is on the person or persons claiming the easement has been abandoned—the Farleys in this case. (*Ward v. City of Monrovia* (1940) 16 Cal.2d 815, 820.)

In their opening brief, the Farleys argue there was "a period of non-use from at least the 1920's to the late 1960's as Fern Flat Road did not connect to the alleged right-of-way from the west." But the portions of the record they cite in support of this contention do not support their claim. On appeal, appellants have an obligation to provide a citation to the record for each factual statement in their brief. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

At oral argument, the Farleys' counsel argued that Fern Flat Road did not exist to the west of Haines Ranch in 1894 at the location where the Right-of-Way now connects to the road. He also asserted there was no evidence anyone used the Right-of-Way to get from Haines Ranch to Fern Flat Road before 1970, and there could not be since Fern Flat Road did not exist at that location prior to 1970. Walt Haines argued that Fern Flat Road was a surveyed road that was always there. We asked the Farleys' counsel to provide us with citations to the record that support the assertion that Fern Flat Road did not exist

45

west of Haines Ranch prior to 1970. Counsel was not able to provide that information at oral argument and we granted the Farleys leave to file a supplemental letter brief containing that information.

We have received the Farleys' supplemental letter brief and reviewed the evidence cited therein. After oral argument, we also re-examined all of the documentary evidence, including the land sale contracts, deeds, and maps with regard to the question whether Fern Flat Road existed to the west of Haines Ranch, at the western end of the Right-of-Way, before 1970.

The earliest reference to Fern Flat Road in the record relates to a survey done by Charles Pioda in 1888. Nielsen (the Farleys' survey expert) prepared an exhibit that demonstrates that modern-day Fern Flat Road is in substantially the same location as that shown on the 1888 Pioda survey, with some changes in the configuration of the road. According to that exhibit, the portion of Fern Flat Road at issue was surveyed by Pioda in 1888. That portion of the road also appears on: (1) a plat map of part of West Valencia dated May 10, 1913; (2) a 1919 topographical map from the U.S. Geological Survey (USGS); and (3) a map of West Valencia that appears to have been created between 1923 and 1927. The maps show that Fern Flat Road existed at the western end of the Right-of-Way until at least 1923. In addition, the property descriptions in the 1894 and 1899 land sale contracts, the 1917 partition decree, and the 1921, 1923, and 1927 deeds, as well as a 1931 deed conveying a nearby parcel to L. Kusalich, all contain references to Fern Flat Road. Thus, the record does not support the Farleys' contention that Fern Flat Road did not exist west of their property prior to 1970.

Based on their supplemental letter brief, the Farleys' contention seems to be that some time in the mid-20th century, a portion of Fern Flat Road—including the western terminal point of the Right-of-Way—disappeared. Hence, they argue, the Right-of-Way never existed on their property. The Farleys cite USGS maps from 1943, 1955 and 1968, and Nielsen's testimony.

46

The 1919 USGS map, which was based on field surveys on the ground, shows a complete, unbroken Fern Flat Road. According to Nielsen, 24 years later, the portion of Fern Flat Road at issue is missing from the 1943 USGS map and Fern Flat Road ends short of that location. The 1943 map was based on aerial photos taken by the U.S. Army in 1937. On cross-examination, Nielsen stated that the terrain along this portion of Fern Flat Road is heavily wooded and that if the area was "too wooded and obscured," the road would not show up in the aerial photos or on the map. He testified that it is possible this portion of Fern Flat Road existed on the ground, even though it is not shown on the map. All he could say is it was not on the map; he could not say whether it was or was not on the ground.

The 1955 USGS map also shows Fern Flat Road ending short of the location at issue. The missing section of the road includes the portions of the road that (1) circle the 110 acres west of Haines Ranch and (2) serve as the northern boundary of Haines Ranch. This map was based on aerial photos taken in 1953. Some areas on the map may have been field-checked, but there was no evidence Fern Flat Road was field-checked. We note the 1957 Purcell deed describes portions of Fern Flat Road that are not shown on the 1955 USGS map, which suggests that the map did not match conditions on the ground.

The "missing" portion of Fern Flat Road reappears on the 1968 USGS map, which was based on the 1955 map, with "revisions" based on aerial photos taken in 1968.

In summary, the evidence supports the conclusion that Fern Flat Road existed west of Haines Ranch in 1894 and 1899 when the parties entered into the land sale contracts and in 1923 when the property was conveyed to the Haineses. The record suggests this part of the road was not depicted on the 1943 and 1955 USGS maps because it was a narrow, unimproved dirt road that may not have been visible in the aerial photos from which the maps were created, since the area was heavily wooded. Walt Haines testified that a portion of Fern Flat Road "further down" (it is not clear what portion of the road he meant) was closed when he was a child, but he did not say when or for how long. In any

47

event, he also testified that all of Fern Flat Road has been passable since Hill & Dale Land Company bought property west of Haines Ranch in 1970, because the company "opened the roads . . . with the idea that they were going to subdivide," and built a wide, "very passable" road.

Even if a portion of Fern Flat Road disappeared for a time in the 1940's or 1950's, it clearly existed when the grant was made years earlier. In our view, that Fern Flat Road may have become unusable because it was in disrepair for some period of time does not defeat the easement. Even if there was evidence that the easement was not used or was in disrepair during the 1940's or 1950's, the Farleys do not point to any evidence of a clear, decisive, and unequivocal intent to abandon all future conforming uses by the owners of the easement at that time. Since they fail to demonstrate both non-use and an intent to abandon during the period of alleged non-use, their abandonment claim fails.

The Farleys also argue that notes on the surveys prepared by Stan Smith in 1972 and 1974, which described Haines Ranch Road as a "right of way of necessity" and stated that "members of the Haines Family have been using this road as their sole access since 1894," evidenced an intent to abandon the easement over the Farleys' property. But the evidence adduced at trial did not show an unequivocal intent to abandon the easement at any time. Instead, Haines testified that he asked Smith to include something in the survey that would help him obtain prescriptive rights to a right-of-way to the east, to Rider Road. Smith came up with the notations on the surveys. Haines testified that he was in his 20's and did not understand the legal implications of the survey notes, and Daniel Haines objected to the notes. Surveyor Dunbar testified that surveyor's notes on the survey do not have any impact on the surveyed property.

We conclude the notations on the surveys do not amount to evidence of a clear, decisive, and unequivocal intent to abandon the Right-of-Way by the owners of Haines Ranch. Haines testified that he used the Right-of-Way continuously from 1970 until it was blocked by the Farleys. DiBenedetti used the Right-of-Way between 1963 and 1974

48

and after. His friends, the Millers, also used the Right-of-Way in the early 1970's. Thus, the Farleys cannot demonstrate non-use during this time frame.

Finally, the Farleys argue that the Haineses are equitably estopped from denying an intent to abandon the easement based on the surveyor's notes asserting "sole access" to the east. Even if there was some form of estoppel on the question of intent, as we have already noted, the Farleys cannot demonstrate non-use during the relevant time period. Their abandonment claim thus fails, and we need not address their estoppel argument further.

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Grover, J.